IN THE UNITED STATES DISTRICT COURT FOR THE

DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| LORIE LARSEN, | ) | |
| | ) | |
| Plaintiff, | ) | 8:13CV313 |
| | ) | |
| v. | ) | |
| | ) | |
| CAROLYN W. COLVIN, Acting | ) | MEMORANDUM OPINION |
| Commissioner of the Social | ) | |
| Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

This matter is before the Court for review, pursuant to 42 U.S.C. 405(g), of the decision of defendant Commissioner of the Social Security Administration("SSA") denying social security disability benefits ("SSD benefits") to plaintiff Lorie Larsen ("Larsen").  Upon review, the Court finds the decision of the Administrative Law Judge ("ALJ") is supported by substantial evidence and should be affirmed.

**PROCEDURAL BACKGROUND**

Larsen filed an application for disability insurance benefits on September 29, 2010 (Tr. 137-43).  The SSA initially denied her application on January 12, 2011, and again upon reconsideration on June 3, 2011 (Tr. 87-90, 92-95).  On September June 29, 2011, Larsen filed a request for hearing and ALJ Jan E. Dutton heard Larsen's claim on June 5, 2012 (Tr. 98-99, 22).  The ALJ issued an unfavorable decision on June 22, 2012, denying

Larsen's claim for disability benefits (Tr. 19-32).  Larsen filed
a request for review of the hearing decision by the Appeals
Council on August 12, 2012 (Tr. 7).  On August 21, 2012, the
Appeals Council denied Larsen's request (Tr. 1-6).

**FACTUAL BACKGROUND**

Larsen is a 50-year-old woman who graduated from high
school and has a vocational license in cosmetology in two states
(Tr. 50).  She has been married for fourteen years and has two
stepsons and five grandchildren (Tr. 50).  Larsen worked in the
past as a cosmetologist and census worker (Tr. 51-52).  She
worked as a hair stylist, but had to stop due to a right shoulder
surgery (Tr. 55-56).  After the surgery, she became a manicurist
(Tr. 55).  She last worked in 2006 when she was diagnosed with
fibromyalgia (Tr. 44).

Larsen alleges she has been disabled since September
11, 2006, due to her fibromyalgia, myofascial pain, moderate
spinal stenosis, mild carpal tunnel syndrome, and history of
right shoulder surgery.  Larsen has been treated by various
physicians for multiple physical impairments.  The degree to
which these impairments debilitate Larsen is in debate.

On January 16, 2006, Larson met with Dr. William Palmer
("Dr. Palmer") and underwent a rheumatological evaluation (Tr.
251).  Larsen had previously been diagnosed with fibromyalgia

-2-

(Tr. 250).  She reported that she felt better all over except for her right arm pain (Tr. 251).  She rated her pain as an "8" on a 10-point scale, all coming from the right arm (Tr. 252).  Dr. Palmer noted that an electromyography (EMG) scan showed minor carpal tunnel on the right, but much worse on the left (Tr. 251).  Dr. Palmer also noted that Dr. Crabb could offer no explanation for her right arm discomfort (Tr. 251).

In February 2006, Larsen returned to Dr. Palmer with complaints of right arm pain (Tr. 250).  Her Phalen's and Tinel's signs were positive, worse on her right (Tr. 250).  Dr. Palmer also indicated an extremely tender trigger point along her right trapezius muscle (Tr. 250).  To alleviate the pain, Larsen was given an injection to the right trapezius tender point (Tr. 250).

In August of 2006, Larsen went to the emergency room with complaints of back pain (Tr. 327).  Larsen rated the pain as severe (Tr. 327).  Larsen had a follow up with her primary care physician, Dr. Kent Johnson ("Dr. Johnson"), later that month (Tr. 309-10).  Larsen had some tenderness around her right scapula, worse near the trapezius and the top of the scapula, but no definite trigger point (Tr. 310).  Dr. Johnson noted a history of fibromyalgia (Tr. 310).  Larsen told Dr. Johnson that she was having difficulty doing her job and was considering retirement (Tr. 310).

-3-

In September of 2006, a magnetic resonance imaging scan ("MRI") of the spine was performed on Larsen (Tr. 307). The MRI revealed (1) mild multilevel degenerative spondylosis without significant spinal stenosis change centrally and laterally and no superimposed disk herniation, and (2) bone marrow edema T3. T4 posterior elements on the right (Tr. 307). A computed tomography ("CT") scan of her thoracic spine was normal (Tr. 306). In November, Larsen had another MRI for her chest and right shoulder (Tr. 299). The chest MRI was negative for the right trapezius muscle, but the right shoulder MRI showed chronic supraspinatus tendonosis and subacromial bursitis (Tr. 299-300).

Larsen met with her primary care physician, Dr. Johnson, on various occasions between November 2006 to February 2009. In November of 2006, Larsen told Dr. Johnson that she continued to have problems with her back and her right arm pain was worsening (Tr. 303). At that time, Larsen was taking Lortab and Flexeril with only partial benefit (Tr. 303). In June of 2008, Larsen told Dr. Johnson that she had pain in her neck and shoulders (Tr. 291). Dr. Johnson found that her neck was tender upon examination (Tr. 291). At another visit in October of 2008, Larsen stated that she had pain in her upper back, she had lots of stress, and was occasionally depressed (Tr. 285). Upon examination, Larsen's right mid-back was tender, but her

-4-

neuromuscular examination was otherwise normal (Tr. 286). Dr. Johnson prescribed Flexeril as needed for her back pain (Tr. 286).

In February of 2009, Larsen had a follow-up MRI and an EMG scan (Tr. 277-79). The MRI scan revealed moderate spinal stenosis at three levels (Tr. 279). There was little change compared to the previous MRI (Tr. 279). An EMG scan suggested very mild bilateral carpal tunnel syndrome (Tr. 277-78). There was no evidence of radiculopathy or other neuropathic process (Tr. 278).

Larsen met with a neurosurgeon, Dr. Keith Lodhia ("Dr. Lodhia"), for a consultation on March 4, 2009 (Tr. 542-44). Larsen rated her pain as a constant "10" on a 10-point scale (Tr. 542). Dr. Lodhia observed that Larsen had good range of motion of the cervical spine without limitation (Tr. 542). She did not have any tenderness with palpation of the spinous process or parvertebral muscles (Tr. 542). Dr. Lodhia did not think that Larsen was a surgical candidate and recommended conservative treatment of epidural injections and possibly physical therapy (Tr. 543). Dr. Lodhia did not see any causation for Larsen's right arm pain (Tr. 543). In addition, Larsen met with Dr. Douglas Rennels ("Dr. Rennels") in March of 2009 (Tr. 342-45). Dr. Rennels administered a cervical epidural steroid injection

-5-

(Tr. 344).  He also recommended physical therapy and medication
(Tr. 344).  Larsen reported at her follow-up that the physical
therapy and steroid injection had helped significantly and that
she felt much better (Tr. 347).

In March of 2010, Larsen met with Dr. Johnson due to
pain in her right arm (Tr. 268).  A second EMG/nerve conduction
study showed little change since the February 2009 study (Tr.
266-67).  Larsen underwent chiropractic treatment in March and
April (Tr. 549-54).  In April, Larsen visited Dr. Johnson again
(Tr. 265).  She stated that she was emotionally wrung out and was
seeing a grief counselor (Tr. 265).  Dr. Johnson assessed
depression, fibromyalgia, and back pain (Tr. 265).  She was not
taking any medications at that time and Dr. Johnson prescribed
Cymbalta and Norflex (Tr. 265).

In September of 2010, Larsen underwent another MRI of
the cervical spine (Tr. 260).  The MRI was stable compared to the
February 2009 MRI (Tr. 261).  Larsen also met with Dr. Johnson in
September (Tr. 262).  She told Dr. Johnson that she was not doing
well, and that she has felt that her right arm is getting
progressively more stiff and sore (Tr. 262).  Dr. Johnson noted
that she was quite frustrated and was wondering if she would
qualify for disability (Tr. 262).  Dr. Johnson informed her that
success at applying for disability was not his determination, but

-6-

she had enough problems to make an application and to see what happened (Tr. 262).

Larsen met with Dr. Johnson again in November of 2010, complaining of decreased concentration and right arm and hand pain (Tr. 370). Dr. Johnson prescribed Savella (Tr. 371). In December, Larsen visited Dr. Johnson for a follow-up (Tr. 366, 425). She reported that the Savella was helping her fibromyalgia (Tr. 366, 425). She was experiencing less pain and had a little more energy (Tr. 366, 425).

In December of 2010, Larsen met with Dr. James Wax ("Dr. Wax") for a physical consultative examination (Tr. 377-84). Dr. Wax observed that Larsen was able to sit continuously throughout the examination, did not use an assistive device, and was able to get up and down from the chair and examining table without a problem (Tr. 381). He noticed that she had some numbness in her right hand and a slight decreased grip strength (Tr. 382). Dr. Wax stated that he did not think Larsen is a candidate to go back to work because of her training as a cosmetologist as she no longer has the stamina to perform the job (Tr. 383).

In January 2011, Dr. Steven Higgins ("Dr. Higgins") reviewed Larsen's medical records and completed a physical residual functional capacity assessment (Tr. 407-15). Dr.

-7-

Higgins opined that Larsen could lift and carry 20 pounds occasionally and 10 pounds frequently (Tr. 408). In addition, Dr. Higgins found that Larsen could sit, stand, and walk for 6 hours during an 8-hour workday (Tr. 408). Dr. Higgins recommended that Larsen avoid frequent repetitive use of hand controls by her right hand due to history of mild carpal tunnel syndrome (Tr. 408).

Dr. Brian Hollis ("Dr. Hollis") performed a second physical consultative examination in May of 2011 (Tr. 427-36). Dr. Hollis noted that Larsen's chief complaints were fibromyalgia, cervical stenosis, and carpal tunnel syndrome (Tr. 427). During the examination, Larsen did not have significant difficulty either performing range of motion or climbing on to examination table (Tr. 433). Dr. Hollis noted that Larsen's most significant component appeared to be fibromyalgia (Tr. 433). Larsen was untreated with medication for the fibromyalgia (Tr. 433). Dr. Hollis recommended exercise and medical intervention to improve fibromyalgia symptoms (Tr. 433). Regarding Larsen's carpal tunnel, Dr. Hollis stated that if symptoms persist, she may want to consider carpal tunnel release which may allow her to perform some of the repetitive movements that she had been unable to perform (Tr. 434).

On May 21, 2012, Dr. Johnson submitted a report in support of Larsen's disability claim (Tr. 546-47). Dr. Johnson opined that Larsen had fibromyalgia, mild spinal stenosis, and carpal tunnel (Tr. 546). Dr. Johnson noted that Larsen has good and bad days, and she is significantly limited by her fibromyalgia and arm pain (Tr. 546). Larsen is only able to sit for 15-20 minutes at one time before she needs to change positions (Tr. 546). Dr. Johnson stated that Larsen would be unable to perform a job where she would have to sit for six hours out of an eight hour day (Tr. 546). Dr. Johnson opined that Larsen has been unable to work eight hours a day, five days a week on a regular and continuing basis since September 1, 2006 (Tr. 547).

## ADMINISTRATIVE HEARING

On June 5, 2012, Larsen testified at a administrative hearing, along with Stephen Schill, a vocational expert. Larsen testified that she could not work because of her fibromyalgia that caused her widespread pain, pain in her right hand and arm, and difficulty concentrating. (Tr. at 55-68). Larsen described her self-treatment as keeping a positive environment, eating well, and taking her medications (Tr. 58). She would try to stay in motion by taking her dog for very short walks and using an exercise ball (Tr. 58). In addition, Larsen gardens two to three

-9-

times per week (Tr. 64).  Larsen was taking Savella for her
fibromyalgia, Melatonin to help her sleep, omega three fatty
acids and vitamin D for low deficiency, and hydrocodone for pain
(Tr. 59).  She testified that she had widespread pain, dominant
on her right side (Tr. 61).  On a good day, her pain level is a
"6" out of 10, and "8" out of 10 on a bad day (Tr. 62).  Larsen
testified that she averages two or three good days per week (Tr.
62).  She can comfortably sit still for 15 to 20 minutes at a
time (Tr. 63).  Larsen trained herself to use her left hand for
various tasks (Tr. 65).  On average, Larsen has to be laying down
during the day for four to six hours (Tr. 66).

Stephen Shill testified in response to a hypothetical
question posed by the ALJ.  The ALJ posed the following question,

> assume an individual who could
> occasionally lift or carry 20
> pounds, frequently lift or carry 10
> pounds; could stand, sit or walk
> for at least six hours in an eight-
> hour day; could occasionally do all
> postural activities, climb,
> balance, stoop, kneel, crouch, and
> crawl; for hands, can use the hands
> for frequent but not constant
> reaching, handling, and fingering.
> There is no restriction in feeling,
> and should avoid concentrated
> exposure to vibration and hazards
> such as dangerous equipment or
> machinery. With that functional
> capacity, could the person return
> to past work?

-10-

(Tr. 70-71).

The vocational expert answered the question by stating that an individual could return to past work as a cosmetologist or a census worker (Tr. 71). The vocational expert testified that there are 2,300 cosmetologist positions in the region and 157,000 in the national economy (Tr. 71). The vocational expert was unable to give any data on the number of census jobs because it is seasonal work (Tr. 71-72). However, the vocational expert listed office helper, photocopy machine operator, and mail clerk as other appropriate light exertional work (Tr. 72). The vocational expert provided data for available positions in the regional and national economy for the positions of office helper, photocopy machine operator, and mail clerk.

Larsen's attorney, Mr. Cuddigan, posed the vocational expert with additional hypothetical questions. Mr. Cuddigan asked the vocational expert to assume,

> she is only able to sit for 15 to
> 20 minutes at one time before she
> needs to change positions; and in
> fact she often has difficulty
> sitting for that long, and often
> has to lie down. She would be
> unable to perform a job where she
> would have to sit for six hours out
> of an eight-hour day. She
> frequently has to recline or lie
> down and rest because of pain and
> difficulty. She is unable to lift
> greater than 10 pounds. She has

-11-

> some problems with concentration
> and memory, primarily because of
> her pain.  She would miss at least
> three days of work a month.  If
> someone had all of those
> limitations, would any competitive
> work exist in the national economy
> that they could perform?

(Tr. 73-74).

The vocational expert stated that there would not be competitive work based on the hypothetical question because of missing work three days per month and frequent lying down (Tr. 74).  In addition, the vocational expert stated that Larson's testimony about the limited use of dominant hand and pain levels would preclude competitive employment (Tr. 74).  Mr. Cuddigan asked the vocational expert to modify the ALJ's hypothetical by changing the handling and fingering requirement to occasional (Tr. 74).  The vocational expert stated that with the change to the hypothetical, that she would not be able to perform past work or the positions of office helper, photocopy machine operator, and mail clerk (Tr. 74-75).

## THE ALJ'S FINDINGS

The ALJ found that Larsen was not under a disability within the meaning of the Social Security Act from September 11, 2006, through the date last insured (Tr. 22).  The ALJ concluded that Larsen had the following severe impairments: fibromyalgia/

-12-

myofascial pain, moderate spinal stenosis, history of very mild carpal tunnel syndrome, and a history of right shoulder surgery in 2003 (Tr. 24).  However, Larsen did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (Tr. 24).  After review of the entire record, the ALJ found that Larsen had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(h) except that Larsen needs to avoid concentrated exposure to vibrations and hazards (Tr. 24-25).  In addition, the claimant can use her hands frequently but not constantly for handling and fingering, with no restrictions in feeling (Tr. 25).  After careful consideration of the evidence, the ALJ concluded that Larsen was not fully credible to the extent of permanent disability (Tr. 30).  Larsen visited many specialists, but no specialist provided work restrictions or endorsed disability (Tr. 30).  The ALJ did not give significant weight to the opinion of Dr. Johnson because his opinion was not supported by his progress notes or other medical evidence of record (Tr. 30).  The ALJ determined that Larsen could perform the full range of light work (Tr. 32).  Consequently, the ALJ concluded that Larsen was not disabled at any time from September 11, 2006, through December 31, 2011 (Tr. 32).

-13-

## STANDARD OF REVIEW

When reviewing an ALJ's decision, the Court "must determine 'whether the ALJ's decision complies with the relevant legal requirements and is supported by substantial evidence in the record as a whole.'" *Martise v. Astrue*, 641 F.3d 909, 920 (8th Cir. 2011) (quoting *Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010)).  "Substantial evidence" is:

> relevant evidence that a reasonable mind might accept as adequate to support a conclusion.  Substantial evidence on the record as a whole, however, requires a more scrutinizing analysis.  In the review of an administrative decision, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight.  Thus, the court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory.

*Id.* at 920-21.

"'If, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision.'" *Partee v. Astrue*, 638 F.3d 860, 863 (8th Cir. 2011) (quoting *Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005)).  The Court may not reverse the ALJ's

-14-

decision "merely because [the Court] would have come to a different conclusion." *Teague v. Astrue*, 638 F.3d 611, 614 (8th Cir. 2011)(citation omitted).  The claimant "bears the burden of proving disability." *Id.* at 615.

### LAW AND ANALYSIS

Larsen argues that the ALJ's decision was not supported by substantial evidence in the following ways:  (1) not assigning proper weight to the opinion of Dr. Johnson; (2) failing to weigh the opinions of the state agency doctors and consultative examiners; (3) the ALJ's hypothetical question did not accurately reflect Larsen's limitations; (4) the ALJ improperly determined Larsen's residual functional capacity; and (5) the ALJ's insufficient assessment of Larsen's credibility.

**1. The Weight given to the Medical Opinions of Larsen's Treating Physician, Dr. Johnson.**

A treating physician's opinion is typically entitled to deference, however, "an ALJ need not defer to such an opinion when it is inconsistent with the substantial evidence in the record." *Strongson v. Barnhart*, 361 F.3d 1066, 1070 (8th Cir. 2004).  An ALJ is warranted in discrediting some of the treating physician's opinions in light of other contradictory evidence in the record. *See Weber v. Apfel*, 164 F.3d 431 (8th Cir. 1999). In this case, the ALJ did not give significant weight to Dr.

Johnson's opinion because it was not supported by his progress notes and other medical evidence of record (Tr. 30).

In May of 2012, Dr. Johnson opined that Larsen had mild spinal stenosis and carpal tunnel syndrome, but she was primarily limited by her fibromyalgia (Tr. 546-47). Dr. Johnson also stated that in his opinion Larsen has been unable to work eight hours a day, five days a week on a regular and continuing basis since September 1, 2006 (Tr. 547). However, the ALJ noted that multiple objective tests resulted in minimal to moderate findings. Larsen visited Dr. Lodhia, a neurosurgeon, in 2009 and he only found mild spondylitic changes but no significant central or foraminal stenosis (Tr. 543). He could not find anything in the cervical spine that caused her symptoms. In September of 2010, Larsen's MRI of her cervical spine was stable as compared to her February 2009 scan (Tr. 320-21). The EMG scans in 2006, 2009, and 2010 demonstrated only very mild carpal tunnel disease (Tr. 30 , 251, 266-67, 277-78, 348, 350-51). In addition, the ALJ took into account the lack of restriction placed on Larsen by other physicians, and the lack of  pain medication. In January of 2011, Dr. Higgins noted that Larsen remained "capable of work as outlined in this RFC" (Tr. 414). In addition, Dr. Hollis recommended "continued exercise and medical intervention" to help improve Larsen's symptoms (Tr. 433). Dr. Hollis also noted that

Larsen was only taking Bayer aspirin, vitamin D, and omega 3 fatty acids in May of 2011 (Tr. 429).  Therefore, the record supports the ALJ's decision to not give Dr. Johnson's opinion significant weight due to the lack of medical evidence of record.

**2. The Weight given to the Medical Opinions of the State Agency Doctors and Consultive Examiners.**

Larsen argues that the ALJ failed to assign any weight to the opinions of the non-examining state agency doctors or the medical records of the consultative examiners.  "Although required to develop the record fully and fairly, an ALJ is not required to discuss every piece of evidence submitted." *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998)(citation omitted).  In addition, "an ALJ's failure to cite specific evidence does not indicate that such evidence was not considered. *Id.*  The ALJ discussed and reviewed all the medical evidence.  The ALJ noted that DDS doctors did not have the advantage of all the diagnostic testing over three years (Tr. 30).  Given the ALJ's discussion of Larsen's medical records and citations, it is highly unlikely that the ALJ did not consider the opinions of the non-examining state agency doctors or the medical records of the consultive examiners.

### 3. **The ALJ's Hypothetical Question**.

"Testimony from a vocational expert constitutes substantial evidence only when based on a properly phrased hypothetical question." *Tucker v. Barnhart*, 363 F.3d 781, 784 (8th Cir. 2004).  The hypothetical question must include all the claimant's impairments supported by substantial evidence in the record as a whole.  *Id.*  However, the hypothetical question need only include those impairments which the ALJ accepts as true. *Rappoport v. Sullivan*, 942 F.2d 1320, 1323 (8th Cir. 1991).

In this case, the ALJ posed a hypothetical question to the vocational expert based on limitations that the ALJ found to be supported by the record (Tr. 31-32, 70-71).  The vocational expert testified that a person could perform Larsen's past profession, in addition to other unskilled light work occupations.  Larsen argues that the hypothetical was erroneous because it did not include all of her impairments because the ALJ failed to properly assess Dr. Johnson's opinion.  This Court previously concluded that the ALJ's determination to not give Dr. Johnson's opinions significant weight is supported by substantial evidence on the record as a whole.  The ALJ presented the vocational expert with a fair hypothetical that accurately set forth Larsen's limitations.

-18-

**4. The ALJ's Determination of Larsen's Residual Functional Capacity.**

Larsen argues that the ALJ's determination of her residual functional capacity is not supported by substantial evidence.  Larsen claims that because the ALJ improperly evaluated the medical evidence, the ALJ arrived at an incorrect residual functional capacity.  This Court has already concluded that the record supports the ALJ's decision to not give Dr. Johnson's opinion significant weight.  In addition, the Court found that the ALJ asked the vocational expert a proper hypothetical.  After considering the evidence of record, the ALJ determined that Larsen had the residual functional capacity to perform light work as defined in 20 C.F.R. § 404.1567(b), except that she needed to avoid concentrated exposure to vibrations and hazards.  The ALJ's determination of Larsen's residual functional capacity is supported by substantial evidence.

**5. Evaluation of Larsen's Credibility.**

An ALJ's credibility findings must be supported by substantial evidence. *Robinson v. Sullivan*, 956 F.2d 836, 839 (8th Cir. 1992).  "In analyzing a claimant's subjective complaints of pain, an ALJ must examine:  '(1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage,

-19-

effectiveness, and side effects of medication; [and] (5) functional restrictions.'" *Dunahoo v. Apfel*, 241 F.3d 1033, 1038 (8th Cir. 2001) (quoting *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984)).  An ALJ is required to make an "express credibility determination" when discrediting a social security claimant's subjective complaints. *Lowe v. Apfel*, 226 F.3d 969, 971-72 (8th Cir. 2000).  If the ALJ gives a "good" reason for not crediting the claimant that is supported by the record, the Court will defer to the ALJ's judgment. *Robinson*, 956 F.2d at 841.

In this case, the ALJ found that Larsen's subjective complaints were not fully credible due to inconsistencies with objective medical evidence, lack of support for Larsen's self-imposed restrictions, and her minimal and conservative treatment. The ALJ noted that Larsen's subjective complaints were out of proportion to objective tests and repeated scans of Larsen's neck, mid back, lower back, nerves and hands which had mild findings.  The ALJ also found no support for Larsen's self imposed restriction, for example training herself to use her left hand, in light of objective evidence.  In addition, no specialist provided work restrictions or endorsed disability.  The Court finds that the ALJ complied with the requirements to disregard Larsen's subjective complaints and that the record as a whole provides substantial evidence to support the ALJ's determination.

-20-

## CONCLUSION

Substantial evidence in the record as a whole supports the ALJ's findings.  The Commissioner's denial of plaintiff's benefits claim will be affirmed.  A separate order will be entered in accordance with this memorandum opinion.

DATED this 2nd day of December, 2014.

BY THE COURT:

/s/ Lyle E. Strom

_____
LYLE E. STROM, Senior Judge
United States District Court